618 F.2d 352
 UNITED STATES of America, Plaintiff-Appellee-Cross Appellant,
v.
Joseph H. IRBY et al., Defendants-Appellants-Cross Appellees.
UNITED STATES of America, Plaintiff-Appellee-Cross Appellant,
v.
T. SMITH & SONS, INC., Defendant-Appellant-Cross Appellee.
 No. 77-2848.
 United States Court of Appeals,
Fifth Circuit.
 June 5, 1980.
 
 Andrew P. Carter, Richard W. Bussoff, New Orleans, La., for T. Smith & sons.
 Joe Sam Owen, Hollis C. Thompson, Jr., W. Joel Blass, Gulfport, Miss., for Joseph H. Irby.
 Robert E. Hauberg, U. S. Atty., Joseph E. Brown, Jr., Asst. U. S. Atty., Jackson, Miss., for plaintiff-appellee-cross appellant.
 Appeals from the United States District Court for the Southern District of Mississippi.
 Before COLEMAN, Chief Judge, KRAVITCH and HENDERSON, Circuit Judges.
 KRAVITCH, Circuit Judge.
 
 
 1
 In this action by the United States to recover a deficiency judgment against the appellant guarantors, the district court awarded the United States $65,568.73. In arriving at its judgment, the court refused to find that the sale of collateral from which the deficiency proceeded was commercially unreasonable. Because the district court applied the wrong body of the law to the issues involved, we reverse and remand.
 
 
 2
 The case involves two loans by the SBA in 1966 and 1970 to the Industrial Steel and Machine Works (Industrial Steel). Prior to the granting of these loans, Industrial Steel had operated a fabrication facility on 21/2 acres of 16th Section Land[1] leased for twenty-five years in 1958 from Harrison County. In 1966 the Gulf National Bank (Gulf) participated with the SBA in lending Industrial Steel $200,000. Industrial Steel secured this loan by a deed of trust covering the 1958 lease of 16th Section Land, 6.6 acres of land held in fee by Industrial Steel, and a Mississippi chattel deed covering machinery and equipment. The note pursuant to this deed of trust was guaranteed by appellant Irby and one James. Between 1966 and 1970, Industrial Steel built a boat yard facility on the 6.6 acre plot held in fee.
 
 
 3
 In 1970 the SBA made the second loan to Industrial Steel for an additional $200,000 without bank participation. The note for this loan was guaranteed by appellants Irby and his wife and a similar guaranty was executed by appellant Smith. As security, the SBA required Industrial Steel to renew the 1958 lease on the 16th Section Land. A new lease was granted by Harrison County for twenty-five years dated April 6, 1970. The 1958 lease was cancelled and this cancellation was recorded pursuant to Mississippi law. Also in April 1970, the appellants executed two assignments of the 1970 lease, one to Gulf to partially secure the 1966 indebtedness and the other to the SBA. Neither of these assignments contained a power of sale. The appellants also executed a deed of trust covering the 6.6 acres held in fee which included the power to sell in event of default.
 
 
 4
 In 1971 Industrial Steel was in financial difficulties, and shortly thereafter the loans were in default. The SBA permitted Irby to attempt to sell the assets privately to satisfy the debt obligation, but he was unable to effect the sale.
 
 
 5
 In June of 1971, Gulf assigned the 1966 promissory note to the SBA along with the 1966 deed of trust covering the 6.6 acres and the 1958 lease. This assignment was recorded December 15, 1971. Gulf also assigned the 1970 lease to the SBA but this assignment was not recorded pursuant to Mississippi law until 1973, well over a year after the foreclosure sale that the SBA directed.
 
 
 6
 Upon the execution of the assignment, the SBA appointed an employee, Phil Dunaway, as trustee of the property held as security and Dunaway subsequently secured an auctioneer to sell the property at a foreclosure sale. The public sale was first scheduled to begin on January 1, 1972. The auctioneer published advertisements describing the property to be sold, including the leasehold, and invited those interested to write for a detailed brochure. This sale was cancelled, apparently, for two reasons: the guarantors, appellants herein, had not been notified of the sale as required by the Uniform Commercial Code in effect in Mississippi, and the SBA could not determine what interest in the leasehold, if any, it was empowered to sell.
 
 
 7
 A new sale was scheduled for February 24, 1972, as a combined sale under the deed of trust and under the UCC commercial documents. In the advertisements for this sale, the lease was not mentioned. Moreover, the brochure did not mention the leasehold interest, and additionally, failed to list certain items that were to be offered for sale and misdescribed others. Although the advertisements for the sale did not list the leasehold interest, the trustee's legal notice of sale[2] described the leasehold as a 1958 lease with a "supplement thereto evidenced by a supplemental lease dated April 6, 1970." Additionally, the legal notice provided: "I will convey only such title as invested in me . . . and the aforesaid property will be sold and conveyed without covenants of representation or warranty, express or implied, and subject to taxes if any . . . "
 
 
 8
 The auction was held on February 24 as scheduled. The items were first offered in bulk and then offered piecemeal item by item for bidding. The sale produced over $300,000. Specifically, the leasehold brought in $16,700. Also sold were inventory items not covered by the deed of trust or by security agreements.
 
 
 9
 At trial appellants offered testimony by a real estate agent who testified that the value of the leasehold was $123,000. Indeed, five years of the twenty-three remaining years of the leasehold was sold immediately after the auction for $30,000. Relying on United States v. Hext, 444 F.2d 804 (5th Cir. 1971), the court below held that the sale was commercially reasonable under state law and awarded deficiency to the government but allowed a credit, for the inventory unlawfully sold, of.$19,000 as the difference between the value of the inventory and what the inventory actually brought at the sale.
 
 
 10
 On appeal the appellants contend that the guarantors should be allowed a credit for the fair market value of the lease less what it realized on the auction. Irby's theory is that the leasehold was not sold in a commercially reasonable manner and that SBA lacked the power to sell the property because the assignments of the 1970 lease did not contain a power of sale. Appellant Smith urges in addition that the sale in bulk followed by a piecemeal offering was not commercially reasonable, and the guarantors are also entitled to various and sundry other setoffs. As cross-appellant, the United States seeks review of the credit granted to appellants for the sale of property not covered by the security agreements. Because the incorrect body of law was applied below, we decline to pass on any of the appellants' claims. As no such disability attaches to the district court's resolution of the government counterclaim, it will be ruled upon.
 
 Federal or State Law
 
 11
 Paragraph (e) of the guaranty agreement between the SBA and appellants provided that the SBA may sell the secured property on default subject only that "such powers to be exercised only to the extent permitted by law." The initial question is: What is the source of the "law" that so limits paragraph (e), federal or state?
 
 
 12
 The Supreme Court has ruled that "federal law governs questions involving the rights of the United States arising under nationwide federal programs." United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). This answer, unfortunately, immediately supplies the next question: What is the source of "federal law": adopted state law or judicially manufactured federal common law?
 
 
 13
 The Kimbell Foods decision is instructive. The case involved the relative priority of liens arising from loans guaranteed by the Small Business Administration and the Farmer's Home Administration. The lower court had held that a uniform federal common law rule established the priority of liens devolving from government programs. The Supreme Court reversed holding that "absent a congressional directive, the relative priority of private liens and consensual liens arising from these Government lending programs is to be determined under nondiscriminatory state laws." 440 U.S. at 740, 99 S.Ct. at 1465. The court balanced the necessity of uniformity of laws governing the particular programs with the interest of the state to regulate commercial activities which are normally governed by state law. In arriving at this balance, the court prescribed the following analytical framework:
 
 
 14
 Controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules . . . Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'
 
 
 15
 Undoubtedly, federal programs that 'by their nature are and must be uniform in character throughout the Nation' necessitate formulation of controlling federal rules . . . Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision. Apart from considerations of uniformity, we must also determine whether application of state law would frustrate specific objectives of the federal programs. If so, we must fashion special rules solicitous of those federal interests. Finally, our choice of law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. (citations and footnotes omitted) 440 U.S. at 727-29, 99 S.Ct. at 1458-59.
 
 
 16
 Because there is no Congressional directive that federal law should apply to the instant case, it falls to this court to perform the Kimbell balancing act.
 
 
 17
 Preliminarily, it is instructive that this court has recently applied the Kimbell Foods decision to a point unresolved by the Supreme Court. United States v. S.K.A. Associates, Inc., 600 F.2d 513 (5th Cir. 1979). In Kimbell the debtor was solvent, and therefore 31 U.S.C. § 191, the "so-called" federal insolvency statute, did not apply. In the S.K.A. Associates case, however, the debtor was insolvent and the court was confronted with the question of whether the federal statute would apply rather than the broader but conflicting state law. It is important to note that in rejecting the applicability of the federal statute, the court stated that the "very detailed opinion for a unanimous Court in Kimbell sought to carefully instruct Government agencies that in their commercial lending activities they are subject to 'customary commercial practices' 440 U.S. at 734, 99 S.Ct. at 1461, and should fare no better, and no worse, than a private lender." 600 F.2d at 516.
 
 
 18
 In addition to participation in "commercial lending activities" militating in favor of a state rule, the validity of the transfer of real property is involved here. Traditionally, the regulation of the transfer of real property has been a local concern.[3] Because the issues confronting this court involve the validity and reasonableness of a foreclosure sale of real property, strong state interests in terms of certainty of state recording mechanisms and title are indisputably present.
 
 
 19
 Federal interest in uniformity does not rise to the level of the state's in this action. It has not been demonstrated that adoption of the nondiscriminatory laws of Mississippi would prejudice the SBA's administration of its loan programs.[4] See United States v. Dismuke, 616 F.2d 755 (5th Cir. 1980). We conclude that for the purpose of determining the reasonableness or validity of the foreclosure sale the body of Mississippi law is to be applied.
 
 
 20
 Which Mississippi Law ?
 
 
 21
 In arriving at its holding, the district court applied the Mississippi Uniform Commercial Code provisions pertaining to default of security obligations, §§ 75-9-501 et seq. In making this selection the court relied on United States v. Hext, 444 F.2d 804 (5th Cir. 1971), in which this court determined that "the rights and liabilities of the parties to suits arising from FHA loan transactions must, under the rationale of the Clearfield Trust Doctrine, be determined with reference to federal law, to be fashioned by the federal courts according to general principles of commercial law." 444 F.2d 809. The court in Hext then determined that the federal law so fashioned would be that of the Uniform Commercial Code. Because the SBA loan program and the FHA loan program have similar aims and a necessity for uniformity, the district court determined that Hext requires that the principles of the Uniform Commercial Code control in the SBA situation.
 
 
 22
 Although the district court's analysis of Hext and application of the Uniform Commercial Code is correct with respect to issues pertaining to the auction of chattel, the court did not distinguish its applicability between the sale of the chattel and that of the real property. Section 75-9-104(j) of the Mississippi Code specifically excludes from coverage transfers of real property, including leaseholds. Accordingly, Mississippi real property law governs the propriety of the sale rather than the U.C.C. See e. g., Miss.Code Ann. § 89-1-55.
 
 
 23
 We therefore reverse and remand for consideration in light of the real property law of Mississippi.
 
 Counterclaim
 
 24
 The United States as counter-appellant contends that the court erred in granting an offset for inventory not subject to any government security interest that was sold during the foreclosure sale. Specifically, the United States, relying on Frederick v. United States, 386 F.2d 481 (5th Cir. 1967), claims that such a counterclaim is barred by sovereign immunity. The government's reliance, however, is misplaced. As in the instant case, Frederick involved a suit by the Small Business Administration against the guarantor of a note for a deficiency judgment resulting from a foreclosure. The guarantor sought to counterclaim for the value of the collateral allegedly bought by the United States at an inadequate price. The district court accepted the argument of the United States that the counterclaim was barred by the doctrine of sovereign immunity and dismissed the guarantor's claim. On appeal, this court reversed, holding that sovereign immunity did not prevent the counterclaim if it arose out of the same transaction or occurrence giving rise to the government's claim. The court in Frederick states at 386 F.2d 488:
 
 
 25
 Our conclusion is that when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the government's claim but not to the extent of a judgment against the (United States) which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount of the government's claims; but the sovereign does not waive immunity as to claims which do not meet the "same transaction or occurrence test" nor to claims of a different form or nature than that sought by it as plaintiff nor to claims exceeding in amount that sought by it as plaintiff. (footnotes omitted)
 
 
 26
 The government contends that because its claim arises in contract and the cross-appellee's claim sounds in tort (conversion), that the test of Frederick is not met. The government thus distinguishes Frederick on the ground that the plaintiff's claim there was found to lie in contract,[5] whereas, in the instant case the plaintiff's claim is definitely conversion because the property sold was wholly outside of the guaranty agreement. The government construes Frederick too closely: the test is not one of dry nomenclature but whether both claims involve the same transaction or occurrence. Here only one transaction forms the basis of both claims: the guaranty. The foreclosure sale occurred as a direct result of the guaranty and the wrongful sale of the inventory occurred as part of the foreclosure. It would be nonsensical for us to hold that the sovereign waives immunity as to items sold negligently as in Frederick but not with respect to recovery for the sale of items which the government had no right to sell. Moreover, the damages are not different in kind. In both instances money suffices. The district court is therefore affirmed as to the counterclaim.
 
 
 27
 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 16th Section Land are tracts reserved for educational purposes but leased by the county until such educational needs require the use of the land
 
 
 [2]
 See Miss.Code Ann. § 89-1-55
 
 
 [3]
 See United States v. Little Lake Misere Land Co., 412 U.S. 580, 605-08, 93 S.Ct. 2389, 2403-05, 37 L.Ed.2d 187 (1973) (Stewart & Rehnquist, JJ., concurring); United States v. Yazell, 382 U.S. 341, 352-58, 86 S.Ct. 500, 506-09, 15 L.Ed.2d 404 (1966); Davies Warehouse Co. v. Bowles, 321 U.S. 144, 155-56, 64 S.Ct. 474, 481, 88 L.Ed. 635 (1944); see also Sunderland v. United States, 266 U.S. 226, 232-33, 45 S.Ct. 64, 65, 69 L.Ed. 259 (1924)
 
 
 [4]
 This conclusion is buttressed by the fact that Mississippi apparently allows terms of sale to be varied by contract. See Miss.Code Ann. § 89-1-57
 
 
 [5]
 In resolving the issue against the government, the court in Frederick stated:
 Defendant's counterclaim here arises from the same transaction or occurrence. Defendant is sued on the guaranty; the status of the parties created by that contract imposes on the plaintiff a duty to the guarantor to deal properly with the security hypothecated by the creditor.